UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ERIC HOLT, | CASE NO. 5:25-CV-00813-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Eric Holt challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation.[1] (Non-document entry dated Apr. 24, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Holt applied for DIB and SSI on January 28, 2022. (Tr. 99). He alleged disability beginning August 13, 2021, due to diabetes mellitus/diabetic ketoacidosis/diabetic neuropathy, orthostatic hypertension, cardiomyopathy/history of myocardial infarction, encephalopathy,

---

[1] This matter was originally referred to Magistrate Judge Reuben Sheperd who recused himself on April 24, 2025. (ECF #7).

cervical radiculopathy, major depressive disorder, generalized anxiety disorder, and neurocognitive disorder. (Tr. 13). After the claims were denied initially and on reconsideration, Mr. Holt requested a hearing before an administrative law judge. (Tr. 144, 149, 154, 159, 164). On December 12, 2023, Mr. Holt (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 53-97). On February 27, 2024, the ALJ determined Mr. Holt was not disabled. (Tr. 10-26). On February 26, 2025, the Appeals Council denied Mr. Holt's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Mr. Holt timely filed this action on April 22, 2025. (ECF #1).

FACTUAL BACKGROUND

## I.     Personal and Vocational Evidence

Mr. Holt was 42 years old on his claimed disability date and 45 years old at the hearing. (*See* Tr. 58-59; ECF #10 at PageID 2667). He has a high school diploma and has attended some college. (Tr. 58). He has past relevant work experience as a utility maintenance worker, maintenance night shift supervisor, car parts sales clerk, data entry clerk, retail store manager, and retail clerk. (Tr. 87-88).

## II.    Relevant Medical Evidence[2]

Mr. Holt was diagnosed with Type I diabetes in 1995, complicated by diabetic ketoacidosis and nocturnal hypoglycemia.[3] (Tr. 2464). On August 12, 2021 (the day he alleged he became disabled), Mr. Holt was admitted to the hospital for diabetic ketoacidosis after his family found him at home unresponsive. (Tr. 459-60, 793-94). He was hyperglycemic, hypotensive, and

---

[2]      Although Mr. Holt claimed disability in part due to mental impairments, his arguments here do not challenge the ALJ's evaluation of those impairments, so I exclude any discussion of those impairments.

[3]      Diabetic ketoacidosis is sometimes referred to in the record as "DKA."

2

tachycardic. (Tr. 793). He developed encephalopathy, renal failure, and acute hypoxic respiratory failure and was referred for palliative care. (Tr. 647, 1001) After 25 days of hospitalization, Mr. Holt was discharged to long-term care. (Tr. 1001). Then in October 2021, Mr. Holt was admitted twice, first with fever, vomiting, tachycardia, acute hypoxemic respiratory failure, and hypoglycemia (Tr. 2229-38) and again two weeks later with nausea, vomiting, and recurrent diabetic ketoacidosis (Tr. 2203).

On June 4, 2022, Mr. Holt underwent a consultative medical examination with William Zuke, M.D., in connection with his disability application. (Tr. 2438-43). There, Mr. Holt described that since his August 2021 hospitalization, his legs were "worse," and he could no longer bend his feet upwards. (Tr. 2438). He wore a blood-glucose monitor that helped control his blood-sugar level. (*Id.*). He reported he could cook, ambulate, and "get through the day without requiring much assistance" although his father moved in to watch over him and help with day-to-day tasks. (Tr. 2438-39). Mr. Holt estimated he could, without issue, sit for hours, stand for one hour, and walk half a mile. (Tr. 2440). On examination, Mr. Holt was borderline obese and had decreased sensation at the mid-tibia, walked slowly with a steppage gait[4] to accommodate his foot drop, could not walk on his heels or toes, and could not stand and hop on one foot, but could squat, stand, and sit. (*See* Tr. 2441-42). Dr. Zuke diagnosed Mr. Holt with diabetes with neuropathy and "bilateral foot drop, possibly due to polyneuropathy." (Tr. 2442).

Since December 2022, Mr. Holt sought care for intermittent numbness in his feet. (*See* Tr. 2524-25). In 2023, his neurologist concluded it was most likely diabetic neuropathy but

---

[4]　　Steppage gait is the inability to lift the foot while walking due to weakness in the muscles that causes dorsiflexion in the ankle joint. *See Steppage Gait, National Institutes of Health*, https://www.ncbi.nlm.nih.gov/books/NBK547672/ (last accessed Feb. 6, 2026).

ordered vascular testing to evaluate Mr. Holt's arterial health and nerve oxygenation. (Tr. 2528). A neurological examination revealed an absent pinprick sensation below Mr. Holt's ankles with "patchy loss on the left leg," absent vibration sense in distal toes and reduced in the ankles, decreased temperature sensation in the left arm, a mildly wide-based gait and unsteady tandem walking, and the pulses on top of his feet were intact though diminished on the right foot. (Tr. 2526-28). Later physical examinations of Mr. Holt's feet yielded findings of diminished pulses on the top and back of both feet, impaired protective sensation, mild tenderness, and decreased strength. (*See* Tr. 2594-95, 2597, 2600, 2603).

On November 21, 2023, Mr. Holt underwent an electromyograph/nerve-conduction study to assess potential neuropathy based on his reported numbness, weakness, and paresthesia in his arms and legs. (Tr. 2609). The study was abnormal, revealing large fiber sensorimotor peripheral neuropathy "mixed" with both axonal and demyelinating features, chronic inactive radiculopathies at multiple cervical levels, and chronic denervation in the right first dorsal interosseous muscle. (Tr. 2610-11).

## III.    Relevant Opinion Evidence

After examining him, Dr. Zuke opined Mr. Holt had no limitations in sitting; mild-to-moderate limitations with standing and walking but could frequently walk short distances; no limitations when lifting weight, but his balance issues may cause some limitations carrying moderate-to-heavy weight; and no limitations in bending, stooping, crouching, squatting, reaching, grasping, handling, fingering, feeling, seeing, or communicating. (Tr. 2443).

On June 19, 2022, state agency medical consultant Leon Hughes, M.D., opined Mr. Holt can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk for up to two hours in an eight-hour workday; can occasionally balance, stoop, kneel, crouch, crawl, and

4

climb ramps and stairs but can never climb ladders, ropes, or scaffolds; should avoid concentrated exposure to extreme temperatures and humidity and all exposure to unprotected heights and dangerous moving machinery. (Tr. 105-06, 113-14). On September 15, 2022, state agency medical consultant Elizabeth Das, M.D., reviewed updated medical records on reconsideration and affirmed Dr. Hughes' opinion except Dr. Das limited Mr. Holt to lifting and carrying ten pounds and allowed for frequent balancing. (Tr. 124-25, 137-38).

On October 11, 2023, Michelle Godek, Ph.D., and Jamie Hart, DPT, conducted a "KEY Functional Whole-Body Assessment" of Mr. Holt's functional capacity. (*See* Tr. 2584-92). They concluded Mr. Holt can lift and carry about 30-45 pounds occasionally and 8-23 pounds frequently and occasionally balance, bend, climb stairs, crawl, crouch, operate foot controls, grasp finely, flex and rotate his head and neck, kneel, and squat. (Tr. 2585).

On November 22, 2023, Mr. Holt's treating endocrinologist Daniela Ciltea, M.D., observed he experiences multiple diabetes-related symptoms like fatigue, episodic blurred vision, excessive thirst, retinopathy, psychological issues, vascular disease, insulin shock or coma, nausea, vomiting, extremity pain and numbness, frequent urination, difficulty thinking and concentrating, and episodes of hyperglycemia and hypoglycemia. (Tr. 2606). Dr. Ciltea opined that Mr. Holt needs at least two-to-three breaks of five-to-ten minutes each during an eight-hour workday. (Tr. 2607). Additionally, Dr. Ciltea stated Mr. Holt's symptoms fluctuate, with good and bad days, and she estimated Mr. Holt would be absent from work three times per month. (Tr. 2608).

## IV.   Relevant Testimonial Evidence

Mr. Holt explained that his diabetes symptoms will be controlled for a few weeks and then his blood-sugar levels will spike or drop. (Tr. 71). He regularly watches his blood-sugar levels, takes insulin with each meal, and carries snacks. (Tr. 71-73, 83). He experiences diabetic neuropathy in

his legs from the knees down, including in his feet and hands. (Tr. 74-75). Lack of sensation in his feet has caused him to fall when standing or to be unable to stand. (Tr. 75). Similarly, he struggles to grip, type, and write with his hands, sometimes causing him to drop things. (Tr. 77). Pain in his neck and spine radiating outward worsens the neuropathy in his hands. (Tr. 78-79).

Mr. Holt also explained he suffers from coronary artery disease and has experienced a heart attack and more frequent chest pains. (Tr. 73). While he has tried to be more physically active to control his diabetes and neuropathy, his heart condition limits his activity. (Tr. 74-76).

Mr. Holt estimated he can walk about a block before needing a break and he stopped twice while walking from the parking lot to the hearing room. (Tr. 76). Open wounds on his feet further limit his ability to walk. (Tr. 78). While he sometimes uses a cane in the house, he does not typically take it out of the house. (Tr. 76-77). He estimates he can lift between 30 and 50 pounds. (Tr. 78).

The ALJ then posed to the VE a hypothetical person with Mr. Holt's age and experience and an RFC matching what the ALJ later formulated (*Compare* Tr. 88-89 *with* Tr. 17). The VE opined such a person could not perform Mr. Holt's previous work, but could perform other work as a document preparer, telephone information clerk, and addresser. (Tr. 89-90). The VE reported there were 145,900 document-preparer jobs, 37,200 telephone-information-clerk jobs, and 22,500 addresser jobs in the national economy. (*Id.*). The VE explained the numbers were modernized versions that reflected those jobs as currently performed and based on reports by the Bureau of Labor Statistics and U.S. Publishing.[5] (Tr. 93-94).

---

[5]    According to its website, U.S. Publishing "markets statistics on employment by occupation. Data is available by city, county, state and national. Professionals who use our data

6

Mr. Holt's counsel then asked about the job numbers, "Is there some sort of methodology, is there a number that, you know, that you're getting that you're paring down from?" (Tr. 95). The VE repeated the numbers came from "U.S. Publishing BLS reports" and that "the numbers that I gave are specific to that DOT." (*Id.*). Mr. Holt's counsel again asked, "is there a specific way that you're breaking it down, like what is the actual method that you're using?" (*Id.*). The VE replied it was based on his "understanding of how the world of work is performed in today's economy and within the limitations or parameters of the hypothetical question." (*Id.*). Mr. Holt's counsel asked once more whether this methodology was something "specific that only you have" or whether it was "reproducible." (Tr. 95-96). The VE answered, "it's something you'd have to have a background in vocational rehabilitation." (Tr. 96).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

---

include vocational consultants, rehabilitation counselors, guidance counselors, job placement specialists, attorneys and disability adjudicators." *See U.S. Publishing,* http://www.uspublishing.net/ (last accessed Feb. 10, 2026). U.S. Publishing produces the Occupational Employment Quarterly and Skilled Employment Quarterly that "utiliz[e] the Bureau of Labor Statistics Occupational Employment Survey (OES) along with the 2010 decennial census" to generate occupational statistics. *See id.,* http://www.uspublishing.net/oeqiii_page.html (last accessed Feb. 10, 2026).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 405.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Holt had not engaged in substantial gainful activity since August 13, 2021—his claimed disability date. (Tr. 13). At Step Two, the ALJ identified the following severe impairments: "obesity, diabetes mellitus/diabetic ketoacidosis/diabetic neuropathy, orthostatic hypertension, cardiomyopathy/history of myocardial infarction, encephalopathy, cervical radiculopathy, major depressive disorder, generalized anxiety disorder,

8

and neurocognitive disorder." (Tr. 13). At Step Three, the ALJ found Mr. Holt's impairments did

not meet or medically equal the requirements of a listed impairment. (Tr. 13-17).

      At Step Four, the ALJ determined Mr. Holt's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform sedentary work as defined in 20 C.F.R.
> §§ 404.1567(a) and 416.967(a) except that the claimant may frequently handle and
> finger, may frequently balance, stoop, may occasionally kneel, crouch, crawl, climb
> ramps and stairs but may never climb ladders, ropes, or scaffolds; the claimant must
> avoid all exposure to unprotected heights, hazardous machinery, and commercial
> driving; the claimant must avoid concentrated exposure to humidity, extremes of
> heat and cold; the claimant is limited to the performance of simple, routine tasks,
> and to the making of no more than simple, work-related decisions, conducted in a
> work setting that is routine, in that it contemplates few changes.

(Tr. 17) (cleaned up). Then the ALJ concluded Mr. Holt could not perform his past relevant work.

(Tr. 24). At Step Five, the ALJ determined Mr. Holt could perform other work in the national

economy, including as a document-preparation clerk, quotation clerk, and addresser. (*See* Tr. 25-

26). Thus, the ALJ concluded Mr. Holt was not disabled. (Tr. 26).

STANDARD OF REVIEW

      In reviewing the denial of Social Security benefits, the court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by

substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833

(6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of

evidence but less than a preponderance and is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective

9

reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000,

2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Mr. Holt argues the ALJ erred four ways: (1) formed the RFC without the support of a current medical opinion by interpreting raw and complex medical data; (2) relied on VE testimony that lacked sufficient indicia of reliability to be substantial evidence; (3) rejected Dr. Ciltea's medical opinion without properly articulating the regulatory factors; and (4) acceped the state agency medical opinions despite later-submitted objective medical evidence documenting a major change in Mr. Holt's condition. (*See* ECF #9 at PageID 2643). I address each argument in turn.

## I.      Interpreting raw and complex medical data

First, Mr. Holt argues the ALJ's decision lacks substantial evidence because the record contained complex and technical medical evidence detailing changes in Mr. Holt's condition after the medical opinions the ALJ relied on were issued and the ALJ interpreted that medical evidence himself rather than obtaining a new opinion.[6] (*See* ECF #9 at PageID 2653-54). The Commissioner responds the ALJ is tasked with crafting the RFC and must necessarily evaluate medical evidence in doing so. (ECF #13 at PageID 2691-93).

Mr. Holt relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908 (N.D. Ohio 2008), and its progeny both in this district and the Southern District of Ohio. (*See* ECF #9 at PageID 2653, 2656). The *Deskin* rule states:

> . . . [when] the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non-examining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ

---

[6]      Mr. Holt separately argues the ALJ erred by relying on outdated medical opinions. *See infra* § IV.

> must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases [in which] the medical evidence shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity.

605 F.Supp.2d at 912 (cleaned up). Following criticism from other district courts in this Circuit, *see, e.g.*, *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010), the *Deskin* Court clarified the rule applied in just two circumstances: (1) when an ALJ made an RFC determination based on no medical source opinion; or (2) when an ALJ made an RFC based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-25, 2011 WL 5024866, at *2 (N.D. Ohio Oct. 21, 2011). Mr. Holt argues his case fits the second scenario because the medical opinions did not take into consideration later exams, tests, and assessments conducted in late 2022 and through 2023 and the ALJ formed his own opinion about that evidence. (*See* ECF #9 at PageID 2653-55).

Though the Sixth Circuit has not addressed *Deskin* and its progeny, it has received considerable negative treatment from courts in this district. *See, e.g.*, *Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-1793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023) ("*Deskin* is a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law."); *Kopis v. Kijakazi*, No. 1:22-cv-2212, 2024 WL 1131058, at *2 (N.D. Ohio Mar. 15, 2024) ("[A]n ALJ's finding that runs afoul of the *Deskin* decision's rationale is not a basis for remand.") (Ruiz, J.). Generally, this is because the ALJ is "charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of [the claimant's] residual functional capacity." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). And there is "[n]o bright-

12

line rule" stating that "medical opinions must be the building blocks of the" RFC. *Tucker v. Comm'r of Soc. Sec.*, 775 F.App'x 220, 226 (6th Cir. 2019). Because applying *Deskin* here would functionally require the ALJ to base the RFC on a medical opinion where a claimant's condition did not improve after state agency review, the District Court could reject this claim to the extent it relies on *Deskin* and its progeny.

Even if the District Court accepted *Deskin* for its persuasive value, the evidence Mr. Holt identified does not require a new medical opinion. Whether the evidence submitted after the medical opinions constitutes a "critical body of objective medical evidence," *see Kizys*, 2011 WL 5024866, at *2, depends on multiple factors, including the length of period of treatment omitted, whether the omitted records contain novel or different symptoms or diagnoses than non-omitted records, and whether the omission of those records would likely change the RFC. *See Law v. Comm'r of Soc. Sec.*, No. 1:22-cv-900, 2023 WL 2787941, at *8 (N.D. Ohio Apr. 5, 2023). The Court must "determine whether it was the type of medical evidence that required a medical opinion" to enable the ALJ to make the disability decision. *Stevenson v. Kijakazi*, No. 5:20-cv-2688, 2022 WL 4551590, at *15 (N.D. Ohio Sept. 29, 2022).

Mr. Holt identifies four pieces of evidence sent after state agency review: a December 2022 neurological examination, August and October 2023 physical examinations, an October 2023 KEY functional whole-body assessment, and a November 2023 electromyograph/nerve-conduction study. (ECF #9 at PageID 2654-55). This evidence covers approximately 15 months from the September 2022 state agency review to the December 2023 hearing. While certainly long, it is less than the multi-year gaps in other cases requiring a medical opinion. *See, e.g., Deskin*, 605 F.Supp.2d at 910 (two years); *Fergus v. Comm'r of Soc. Sec.*, No. 5:20-cv-2612, 2022 WL 743487, at *11 (N.D.

Ohio Mar. 11, 2022) (four years). And the record of those 15 months documents just five interactions with healthcare providers.

Mr. Holt argues the evidence shows a worsening condition with an abnormal gait, decreased sensation in his arms and legs, and worsening diabetes control. (ECF #9 at PageID 2656). But the records do not reflect novel or different symptoms. Rather, they show a continuation of Mr. Holt's symptoms of diabetic neuropathy and foot drop present at the time of the state agency review. (*See* Tr. 120 and 133 ("Comments: +foot drop . . . dx: Diabetic peripheral neuropathy"), Tr. 122 and 135 ("Evidence in file shows gait intact, unable to walk on his heels and toes and decreased sensation in feet."), Tr. 124 and 137 ("Examination findings to support the diagnoses include decreased sensation, mid tibia distally bilaterally in addition to inability to dorsiflex the bilateral feet in addition to his accommodative gait to accommodate his foot drop.")).

The state agency consultants assessed records from multiple hospitalizations in 2021 that document Mr. Holt's diabetes and related symptoms. Little changed in Mr. Holt's gait after the state agency review. Though reviewers characterized it as "intact" (Tr. 122, 135), his gait was characterized both before and after state agency review as "wide-based" (*compare* Tr. 2441-42 (June 2022) *with* Tr. 2527 (December 2022)). While the new records do show Mr. Holt did receive care for a wound to his right foot, the wound was attributed to his diabetes and it healed well over two months. (*See* Tr. 2594-95, 2597, 2600, 2603). This is far from cases where a new medical opinion was needed to analyze new treatments or failed treatments occurring after state agency review. *See Gonzales v. Comm'r of Soc. Sec.*, No. 3:21-cv-93, 2022 WL 824145, at *10 (N.D. Ohio Mar. 18, 2022) (claimant did not improve after total left knee replacement surgery); *Earick v. Comm'r of Soc. Sec.*, No. 3:20-cv-234, 2021 WL 4552396, at *3 (S.D. Ohio Oct. 5, 2021) (new evidence documented

"abnormal findings, MRIs, multiple steroid injections, and two surgical procedures."), *report and recommendation adopted*, 2021 WL 4948345 (S.D. Ohio Oct. 25, 2021).

Mr. Holt is correct the wound-care examinations did document "diminished dorsalis pedis and posterior tibial pulses," "severely impaired protective sensation," and "episodes of mild tenderness with 4/5 lower-extremity strength." (*See* ECF #14 at PageID 2706) (citing Tr. 2594-95, 2597, 2600, 2603). Yet the decreased sensation in his foot was not new. (*See* Tr. 122 and 135 ("Evidence in file shows . . . decreased sensation in feet."), Tr. 124 and 137 ("Examination findings to support the diagnoses include decreased sensation")). Dr. Zuke, who examined Mr. Holt before state agency review, noted his sensation was "decreased from mid tibia distally" (Tr. 2442), with 0/5 dorsal flexion and 5/5 strength otherwise (Tr. 2444). He did not find any issues with Mr. Holt's arm strength. (Tr. 2444). Dr. Zuke translated his findings into an opinion on Mr. Holt's functioning. (Tr. 2443).

While the state agency physicians lacked the benefit of the 2023 functional whole-body assessment, it does not follow that the ALJ interpreted it as raw medical data. Though the assessment included extensive physical examination findings (*See* Tr. 2584-92), it translated those findings into an opinion about Mr. Holt's functioning. (Tr. 2585). While the assessment certainly post-dates the state agency review, the ALJ did not need to seek out a medical opinion to explain the results but properly analyzed it like a medical opinion. (*See* Tr. 22-23).

Mr. Holt's best argument is the November 2023 electromyograph/nerve-conduction study. Courts have been more critical of ALJs interpreting the results of neurological examinations without a medical opinion. *See Mascaro v. Colvin*, No. 1:16-cv-436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016), *report and recommendation adopted*, 2016 WL 7368676 (N.D. Ohio Dec. 20,

2016). Because the study was completed after state agency review, the medical consultants could not consider the functional effects resulting from decreased sensation in his arms it documented.

But the ALJ did not need a new medical opinion to interpret Mr. Holt's functional condition because another medical opinion, issued around the same time the neurological study was conducted, was available for the ALJ's review. As the *Kizys* Court noted, an ALJ can use other medical opinions as "a guide to peg a residual functional capacity finding." *Kizys*, 2011 WL 5024866, at *2 (discussing *Henderson*, 2010 WL 750222). As courts have observed, this often manifests when the ALJ rejects a medical opinion based on other evidence in the record. *Falkosky v. Comm'r of Soc. Sec.*, No. 1:19-cv-2632, 2020 WL 5423967, at *7 (N.D. Ohio Sept. 10, 2020). Dr. Ciltea did not opine Mr. Holt had a loss of manual dexterity (Tr. 2606) and she opined Mr. Holt did not have significant limitations in reaching, handling, or fingering (Tr. 2608). The ALJ concluded Dr. Ciltea's opinion "understate[d] [Mr. Holt's] manipulative and environmental limitations." (Tr. 22). Thus, the ALJ did not have to interpret Mr. Holt's neurological condition based on the neurological study but had Dr. Ciltea's opinion as "a guide to peg" the manipulative limitations to. *See Kizys*, 2011 WL 5024866, at *2.

Thus, even if the District Court applied *Deskin*, the evidence from 2022 and 2023 does not comprise a "critical body of objective medical evidence" that required the ALJ to seek a new medical opinion. *See Kizys*, 2011 WL 5024866, at *2; *see also Law*, 2023 WL 2787941, at *8 (suggesting factors to guide the inquiry). While there was approximately 15 months of treatment after state agency review, there were only five interactions over that period. The wound-care treatment of Mr. Holt's foot was a new symptom but the wound healed, and both the wound-care and neurological examinations of his feet did not show any novel or different neurological

16

symptoms not mentioned in the consultative examination or state agency review. The whole-body functional assessment made conclusions in functional terms, so the ALJ did not have to interpret the raw examination data. Similarly, Dr. Ciltea considered Mr. Holt's functional condition the day after the neurological examination of his arms and opined no manipulative limitations, so the ALJ had that opinion on which to base the manipulative limitations in the RFC. Thus, if *Deskin* applied, it would not require a new medical opinion.

I thus decline to recommend remand on this basis.

## II.    Reliability of the vocational expert's testimony

Next, Mr. Holt argues the VE's testimony about the number of jobs a person with Mr. Holt's age, experience, and RFC could perform in the national economy was too vague and conclusory to constitute substantial evidence supporting the ALJ's Step Five findings. (*See* ECF #9 at PageID 2657-58). He argues the VE's testimony was unreliable because "Counsel directly asked the VE whether his methodology for generating job incidence data was reproducible, the VE conceded that it was not" and the VE "provided no explanation, source breakdown, or mathematical formula for how he derived the specific job incidence numbers presented" and there was "no objective or reviewable means by which the data could be verified." (*Id.* at PageID 2658). The Commissioner responds the VE's testimony meets the "not high" threshold for substantial evidence. (ECF #13 at PageID 2695-96).

Disability hearings are conducted in "an informal, non-adversarial manner" and involve evidence that "would not be admissible" if in a civil trial. *See* 20 C.F.R. §§ 404.900(b), 404.950(c), 416.1400(b), 416.1450(c); *see also* 42 U.S.C. §§ 405(b) (1), 1383(c)(1)(A). So far, the Supreme Court has declined to adopt categorical rules to assess the reliability of VE testimony and instead

held that the reliability of VE testimony must be assessed on a "case-by-case" basis that "takes into account all features of the [VE's] testimony, as well as the rest of the administrative record." *See Biestek v. Berryhill*, 587 U.S. 97, 100 (2019). A claimant may "probe the strength" of a VE's testimony by, among other things, "asking [the VE] about (for example) her sources and methods— where she got the information at issue and how she analyzed it and derived her conclusions." *Id.* at 107. But judicial review on this issue "defers to the presiding ALJ, who has seen the hearing up close." *Id.* at 108.

Mr. Holt argues the VE's testimony cannot be substantial evidence at Step Five because the VE's unique methodology for finding the number of jobs Mr. Holt could perform was not reproduceable. Mr. Holt objected on this basis to the ALJ. (Tr. 364). The ALJ overruled the objection:

> Note is made of the objection by the claimant's representative to the methodology and reporting of the numbers of jobs within the national and regional economies, as related by the vocational expert. It seems clear that the objection is addressed to the means selected by the federal government for gathering and publishing labor statistics, and to the calculations of the vocational expert at the hearing. As such, the objection flows both to the relevance of the statistics themselves and to the interpretation of those statistics by the vocational expert. It is noted that the vocational expert has been qualified as such by the Social Security Administration and that the very essence of the expert's appearance at these hearings is the employment of their professional experience, expertise and acumen to filter the vagaries of the various hypothetical residual functional capacities first, through the touchstone of the Dictionary of Occupational Titles and second, through the "lens" of their own professional knowledge. Upon consideration of which, I find no reason to reject the testimony of the vocational expert, and no authority to affect the manner in which the federal government collects and publishes labor statistics. The objection is overruled.

(Tr. 10).

Mr. Holt cites three cases to argue the VE's testimony was unreliable: *Springer v. Comm'r of Soc. Sec.*, 451 F.Supp.3d 744, 766-69 (E.D. Mich. 2020), *Ensley v. Comm'r of Soc. Sec.*, No. 3:21-cv-

326, 2022 WL 5287798, at *6-7 (E.D. Tenn. Aug. 10, 2022), and *Nunley v. Berryhill*, No. H-17-72, 2018 WL 1167700, at *9 (S.D. Tex. Feb. 14, 2018), *report and recommendation adopted*, 2018 WL 1122679 (S.D. Tex. Mar. 1, 2018). *Ensley* is not applicable because the errors there lay in the ALJ's failure to discuss the claimant's rebuttal VE testimony (none was presented here) or post-hearing objections (which the ALJ here decided). *See Ensley*, 2022 WL 5287798, at *11. But *Springer* and *Nunley* each address the reliability of the VE's testimony on job numbers. In *Springer*, the error lay in the ALJ's lack of a logical bridge between crediting the VE's testimony and the lack of information about how the VE relied on her experience to figure out the number of available jobs. *See* 451 F.Supp.3d at 766-67. In *Nunley*, the error arose from the VE's use of SkillTRAN, a private program not among the listed reliable sources in the regulations, to find numbers of jobs and the VE could not endorse the accuracy of the information. *See* 2018 WL 1167700, at *8-9.

Here, the ALJ's objection ruling was the logical bridge that was missing in *Springer*. Both here and in *Springer*, the VE and claimant's counsel had similar exchanges about the VE's use of their own experience in estimating job numbers. *Compare Springer*, 451 F.Supp.3d at 766-67 *with* Tr. 95-96. Both VE's conceded they used unique methodologies based on their own experiences in job placement and the results could not be replicated. But the ALJ in *Springer* simply concluded the job-number estimates were reliable because they were "not inconsistent with" the DOT and made no attempt to bridge how a VE's experience "allowed her to reasonably extrapolate from generalized BLS statistics—that were not broken down by specific position—to the specific job estimates she provided." *See* 451 F.Supp.3d at 767.

By contrast, the ALJ here noted separately that federal labor statistics are complex, the statistics are not straightforwardly published, and the VE's task is to "to filter the vagaries of the

various hypothetical residual functional capacities first, through the touchstone of the Dictionary of Occupational Titles and second, through the 'lens' of their own professional knowledge." (*See* Tr. 10). As one court summarized the complicated task before the VE:

> To obtain a job-numbers estimate, a vocational expert may consult a publication like the DOT. The DOT groups jobs into "occupations" based on their similarities and assigns each occupation a code number. The court in *Goode* went on to explain:
>
>> Aside from being three decades old, the DOT presents other difficulties. DOT codes, for example, do not provide statistical information about the number of jobs available in the national economy. Instead, the vocational expert must look to other sources like the Occupational Employment Quarterly (OEQ), which is compiled by a private organization called U.S. Publishing, to find employment statistics. The OEQ database, however, does not compile data by DOT codes, but rather through the Standard Occupational Classification (SOC) system.
>>
>> The SOC system groups together detailed occupations with similar job duties. As a result, a single SOC group may contain multiple DOT occupations. In the words of the Seventh Circuit, "[t]he use of one system to supply the job titles and another [system] to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist." To provide some assistance in this regard, the Bureau of Labor Statistics has published a crosswalk which provides the corresponding SOC group code for each DOT occupation.

*See Behnam v. Comm'r of Soc. Sec.*, No. 1:20-cv-12876, 2022 WL 1055531, at *5 (E.D. Mich. Feb. 16, 2022) (cleaned up), *report and recommendation adopted*, 594 F.Supp.3d 877 (E.D. Mich. 2022). The same problem befell the VE here—the age of the DOT, the imprecision of job titles, and the VE's use of U.S. Publishing data—and each issue was raised in the hearing. (*See* Tr. 95-96). This was not a situation like *Nunley* where the VE outsourced interpretating the available labor statistics to SkillTRAN, a separate program that neither the VE nor the ALJ knew to be reliable. *See* 2018 WL 1167700, at *8-9.

Thus, the VE's reliance on data compiled by U.S. Publishing and the use of a unique methodology based on her experience to pair that data with DOT job titles did not make the VE's testimony inherently unreliable. Mr. Holt cross-examined the VE, raised his concerns with the ALJ, and the ALJ accepted the vocational expert's testimony over his objections. The ALJ provided a logical bridge for how the difficulties in using labor statistics and the imperfect application of those statistics in RFC hypotheticals are resolved by "employment of [a VE's] professional experience, expertise and acumen." (*See* Tr. 10). And the Supreme Court has held that after the claimant tests the VE's testimony, judicial review on the issue "defers to the presiding ALJ, who has seen the hearing up close." *Biestek*, 587 U.S. at 108.

I thus decline to recommend remand on this basis.

## III.   Analysis of the persuasiveness of Dr. Ciltea's medical opinion

Then, Mr. Holt argues the ALJ erred in finding Dr. Ciltea's opinion to be unpersuasive when it was supported by and consistent with the medical evidence and other medical opinions in the record and the ALJ did not consider the regulatory factors of Dr. Ciltea's treating relationship with Mr. Holt and her specialization in endocrinology. (ECF #9 at PageID 2659-62). The Commissioner responds the ALJ properly applied the regulatory factors and Mr. Holt's argument amounts to an impermissible invitation to reweigh the evidence. (ECF #13 at PageID 2696-99).

As part of the RFC assessment, the ALJ must review all medical opinions and explain how persuasive he finds them. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors

that support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).

The regulations require the ALJ to "explain how [the ALJ] considered the supportability and

consistency factors for a medical source's medical opinions," the two principal factors. *See id.*

§§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ need not specifically use the terms "supportability" or

"consistency" so long as the analysis substantively engages with those factors. *Cormany v. Kijakazi*,

No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022). If the ALJ discusses both

consistency and supportability and substantial evidence supports that discussion, the court may

not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL

5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354

(N.D. Ohio Nov. 4, 2021).

> The ALJ analyzed Dr. Ciltea's opinion as follows:

> The claimant's endocrinologist, Daniel[a] [Ciltea], M.D., indicated, on November 22, 2023, that the claimant would have rare interference to his attention and concentration, could perform low stress work, could sit for six, stand and walk for two, of eight hours, in increments of forty-five minutes, would need two or three unscheduled breaks of five-to-ten minutes' duration, could lift and carry up to twenty pounds, could not climb ladders, ropes, or scaffolds, could occasionally twist, stoop, crouch, climb stairs, and would be absent three times per month. Dr. [Ciltea] has treated the claimant and is reporting within the bounds of [her] professional certifications and specialty. However, [she] would not attest that the claimant met the durational requirements for disability, owing to the intermittent nature of his symptoms. [Her] opinion regarding standing and walking imposes limitations in excess of those abilities the claimant concedes. Low stress work has little vocational, and no policy-compliant effect. By comparison with the overall evidence of record, described in digest form in the analysis of the opinions of Drs. Hughes and Das, above, this opinion overstates the claimant's exertional capacity, in regard to lifting, and understates his manipulative and environmental limitations. By comparison to the overall evidence of record, described in digest form below, in the analysis of the opinion of Ms. Swain, Dr. [Ciltea] does not comment on the claimant's ability to understand, remember and apply information and describes adaptive limitations in terms too vague to be of assistance in assessing the residual functional capacity. For all of these reasons, this opinion is not persuasive.

(Tr. 22) (citations omitted).

Mr. Holt does not argue substantial evidence does not support the ALJ's finding that Dr. Ciltea's "opinion regarding standing and walking imposes limitations in excess of those abilities the claimant concedes." (*Id.*). Nor does he argue the ALJ's incorporated discussion of Drs. Hughes's and Das's opinions (finding limitations to sedentary work, frequent balancing and bending, mild manipulating, and no environmental extremes or workplace hazards) lacked substantial evidence. (*See* Tr. 21-22) (analyzing Drs. Hughes's and Das's opinions).

Rather, Mr. Holt argues Dr. Ciltea's opinion was (1) supported by his diabetes-related hospitalizations, clinical assessments of his neurological issues, and the electromyograph/nerve-conduction study; (2) consistent with the findings of the whole-body functional assessment, Dr. Hayes (Mr. Holt's podiatrist), and Dr. Zuke (the consulting examiner); and (3) persuasive because of Dr. Ciltea's long treating relationship with Mr. Holt and her specialty in endocrinology. (ECF #9 at PageID 2659-62).

But the court cannot perform an independent reweighing of the regulatory factors and reach a different conclusion than the ALJ. *See Brainard*, 889 F.2d at 681. Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. To show a lack of substantial evidence, Mr. Holt must do more than "point[] to evidence of the record that supports [his] position" that under his application of the regulatory factors, Dr. Ciltea's opinion was persuasive. *Greene ex rel. Greene v. Astrue*, No. 1:10-cv-414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). Moreover, Mr. Holt's application overlooks the ALJ's consideration of the treating-relationship and specialization factors: "Dr. Citlea

has treated the claimant and is reporting within the bounds of [her] professional certifications and specialty." (Tr. 22).

I thus decline to recommend remand on this basis.

## IV.  Analysis of the prior administrative medical findings

Last, Mr. Holt argues the ALJ erred in relying on the state agency examiners' opinions when later-submitted medical evidence contradicted their conclusions. (ECF #9 at PageID 2662-64). He names the same four pieces of evidence he argues the ALJ interpreted on his own: a December 2022 neurological examination, August and October 2023 physical examinations, an October 2023 KEY functional whole-body assessment, and a November 2023 electromyograph/ nerve-conduction study. (*Id.* at PageID 2663-64). He argues they are inconsistent with the ALJ's findings of mild but intermittent symptoms and normal gait, and they support greater functional limitations. (*See id.*). The Commissioner responds that the ALJ considered the later-submitted evidence and accordingly found greater limitations than the state agency reviewers opined to. (ECF #13 at PageID 2700-01).

State agency examiners necessarily lack the benefit of later-submitted evidence to the ALJ "because state agency review precedes ALJ review" so "there is always some time lapse between the consultant's report and the ALJ hearing and decision." *Jones v. Colvin*, No. 5:13-cv-1781, 2014 WL 4594812, at *3 (N.D. Ohio Sept. 12, 2014) (internal quotation omitted). Under Sixth Circuit caselaw, an ALJ can rely on the opinion of state agency physicians who did not review later-submitted medical records so long as there is "some indication that the ALJ at least considered" the later-submitted evidence "before giving greater weight to an opinion that is not based on a

review of a complete case record." *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009); *see also Stevenson*, 2022 WL 4551590, at *14 (collecting Sixth Circuit cases).

Here, the record shows the ALJ appropriately considered the evidence post-dating the medical opinions. In discussing the state agency medical opinions, the ALJ cited, among others, to the December 2022 neurological examination in noting Mr. Holt had cervical radiculopathy "without clinical evidence of adverse effect on dexterity or grip strength" (Tr. 21) (citing Tr. 2529) and has "preserved strength and neurological function including . . . coordination." (*Id.*). The ALJ noted the August 2023 physical examination, among other evidence, in concluding "[t]he record shows an obese claimant, compounding the effects of diabetes and diabetic neuropathy, but the symptoms of which remain intermittent." (Tr. 21) (citing Tr. 2594). The ALJ also cited the electromyograph/nerve-conduction study, noting "[t]he claimant has newly diagnosed cervical radiculopathy." (Tr. 21) (citing Tr. 2610). While the ALJ did not discuss the functional whole-body assessment when analyzing the state agency medical opinions, the ALJ analyzed the assessment as a separate opinion. (*See* Tr. 22-23) (citing Tr. 2584 and 2591). This discussion on the state agency opinions and elsewhere is "some indication that the ALJ at least considered" the later-submitted medical evidence. *See Blakley*, 581 F.3d at 409. The ALJ also thought the evidence had some merit as the ALJ found greater exertional, postural, and manipulative limitations than the state agency reviewers.

I thus decline to recommend remand on this basis.

25

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I

recommend the District Court **AFFIRM** the Commissioner's decision denying DIB and SSI.

Dated: February 10, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and
Recommendation, a party may serve and file specific written objections to the
proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ.
P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted
objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or
waiver of the right to raise the issue on appeal, either to the district judge or in a
subsequent appeal to the United States Court of Appeals, depending on how or
whether the party responds to the Report and Recommendation. *Berkshire v.
Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not
merely indicate a general objection to the entirety of the Report and
Recommendation; "a general objection has the same effect as would a failure to
object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir.
1991). Objections should focus on specific concerns and not merely restate the
arguments in briefs submitted to the Magistrate Judge. "A reexamination of the
exact same argument that was presented to the Magistrate Judge without specific
objections 'wastes judicial resources rather than saving them and runs contrary to
the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL
3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The
failure to assert specific objections may in rare cases be excused in the interest of
justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).